UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re SCOTT D. ANDREWS,<br><br>    Debtor. | Chapter 13 Case No. 23-40885-EDK |
| SCOTT ANDREWS,<br><br>    Appellant,<br><br>v.<br><br>EQUITY HOLDING CORP.,<br><br>    Appellee. | Civil Action No. 25-11996-GAO |

OPINION AND ORDER
March 31, 2026

O'TOOLE, D.J.

Appellant Scott D. Andrews appeals the final disposition of his bankruptcy adversary proceedings against the appellee, Equity Holding Corporation, a California non-profit ("Equity"). Relevant here, the Bankruptcy Judge dismissed Counts I, II, and V of the amended complaint in full and dismissed Count IV in part. After a bench trial on the remainder of Count IV, the Bankruptcy Judge entered judgment in favor of Equity on that count. For the following reasons, those rulings are affirmed.

## I.    Background

At the center of the parties' dispute is 56 Lyndale Avenue, a residential home set on a one-half acre parcel of land in Methuen, Massachusetts (the "Property"). Andrews has resided there since 1990, and ownership of the Property "in fee simple" was transferred to him in 2000.

(Appellant's Br. App. Vol. 1 ("App. Vol. 1") at 58 (First Am. Compl. ("Am. Compl.") ¶¶ 10–11) (dkt. no. 14).) That same year, Andrews received a mortgage loan secured by the Property from Washington Mutual, a non-party. The appellant later fell into arrears on the mortgage, and by January 2005, a foreclosure sale of the Property appeared imminent.[1] Andrews ultimately avoided foreclosure, however, because Equity supplied him with enough capital to settle the delinquent payments on the mortgage. In exchange, Andrews transferred his ownership interest in the Property to a trust of which Equity is the sole trustee (the "Trust"). Andrews effected the transfer via quitclaim deed dated January 6, 2005.

At the same time, the parties also executed several related written agreements, many of which—including, as is relevant here, the Trust Agreement and the Occupancy Agreement—are attached as exhibits to the amended complaint.[2] Under the Trust Agreement, Andrews is the Trust's primary beneficiary, holding ninety-five percent of the total beneficial interest. The remaining five percent is divided evenly between two co-beneficiary investors, which are non-parties to this action.

The Trust's purpose—as set forth in the Trust Agreement's express terms—is for Equity to "hold [the Property], and the proceeds and profits from it, in trust for the ultimate use and benefit of the Beneficiaries . . . and conserve title to [the Property] until its sale or other disposition." (Id., Ex. B, Trust Agreement at § 1.) The Trust's initial term was two years, ending January 6, 2007, which term could "only be extended further by mutual direction of beneficiaries [sic]." (Id. at § 13.) In any event, however, the agreement mandates that if the Property "remains in the Trust

---

[1] The amended complaint is vague as to the timing: "Mr. Andrews subsequently fell into arrears on [the] mortgage." (Am. Compl. ¶ 13.)

[2] The Court refers to the various written agreements and corresponding schedules attached to the amended complaint collectively as the "Trust Contracts."

twenty (20) years after the date of January 6, 2005," Equity "shall give written notice to the Beneficiaries of the proposed termination of the Trust." (Id.)

Andrews and Equity also entered into an Occupancy Agreement to allow Andrews to continue residing at the Property under a "lease" from Equity. The Occupancy Agreement contemplates an initial term, beginning January 6, 2005, that could be extended "for no longer than the term of the [T]rust" unless otherwise authorized by the Trust's beneficiaries. (See id., Ex. B. at § 8 (Occupancy Agreement).) The Occupancy Agreement also sets forth the parties' rights and duties with respect to use of the Property—Andrews as "Tenant" and Equity, in its capacity as trustee, as "Landlord." (Id. at ¶ 1.) Like the Trust Agreement, the Occupancy Agreement expressly states that, as trustee, Equity "holds title" to the Property. (Id. at § 8.)

Shortly after executing these agreements, in July of 2005, Andrews filed a bankruptcy petition under Chapter 13 of the Bankruptcy Code (the "2005 Petition"). (Am. Compl. ¶ 2.) As part of the 2005 Petition, Andrews filed a proposed bankruptcy plan, which expressly states that Andrews "intends to file an Adversary Proceeding"—i.e., a second, parallel action separate from the 2005 Petition—"to void the transfer of his personal residence into a trust." (Chapter 13 Plan at 3 (dkt. no. 10-7).) Equity objected to confirmation of the proposed plan on the grounds that it did not "accurately state fact of title to [Andrews'] claimed real property," namely 56 Lyndale Avenue. (Equity's Obj. to Chapter 13 Plan at 1 (dkt. no. 10-8).) In light of Equity's objection and Andrews' stated intention to file separate adversary proceedings, the presiding bankruptcy judge held the 2005 Petition in obeyance. (See Bankr. Ct. Order, Oct. 18, 2005 (dkt. no. 10-9).)

Andrews ultimately commenced adversary proceedings against Equity in December of 2005. The case was eventually dismissed for lack of prosecution. Despite Andrews' failure to prosecute the adversary case, in October 2006, the bankruptcy judge entered an order confirming

the plan in the 2005 Petition. The order contains no reference to Equity's objection to the plan or the dismissed adversary proceedings.

From 2006 to 2023, Andrews and Equity "had little, if any, correspondence." (Am. Compl. ¶ 57.) Andrews says that during this time he "continually paid his mortgage obligation directly to his mortgage servicer" and "never made any rent payments to" Equity. (Id. ¶ 58.) Further, he "does not recall any instance of [Equity] attempting to enforce its rights as Trustee of the Trust, or as a landlord," (id. ¶ 59), or "any correspondence with [Equity] pursuant to which he agreed to extend the term of the Trust in his capacity as a beneficiary," (id. ¶ 60). In 2023, Equity, through counsel, notified Andrews that it intended to exercise its purported contractual right to sell the Property pursuant to the Trust Agreement. Andrews, in turn, commenced this action seeking, in essence, to void the quitclaim deed and Trust, or otherwise obtain the Trust's interest in the Property.

## II.    Procedural History & Jurisdiction

On June 13, 2024, the Bankruptcy Judge dismissed Count I (Quiet Title), Count II (Equitable Mortgage), Count III (Constructive Trust), and Count V (Violation of Massachusetts General Laws Chapter 93A (Chapter "93A")) of the first amended complaint, leaving only Count IV, a claim for unjust enrichment, which the Bankruptcy Judge dismissed in part.[3] The Bankruptcy Judge reasoned that all of Andrews' claims were barred by the relevant statutes of limitations under Massachusetts law. Andrews, in turn, sought leave to file an interlocutory appeal, which the Bankruptcy Judge and another session of this District Court denied. The Bankruptcy Judge then presided over a bench trial of the remainder of Count IV. (See App. Vol. 1 at 282.) On July 2,

---

[3] On appeal, Andrews "waives all claims" related to Count III, which asked the Court to impose a constructive trust over the Property. (Br. of Appellant Scott Andrews at 46 (dkt. no. 13).)

2025, the Bankruptcy Judge entered judgment in favor of Equity, thereby disposing of the action. (App. Vol. 1 at 300 (J. of Katz, C.J.).)

This timely appeal follows. On July 14, 2025, the appellant elected to pursue his appeal before this Court. See 28 U.S.C. § 158(c)(1). This Court has appellate jurisdiction over Counts I, II and IV as "core proceedings." Id. § 157(b)(1). Count V, a claim under Chapter 93A, is a "related to" or non-core proceeding under the Bankruptcy Code. See generally Roy v. Canadian Pac. Ry. Co. (In re Lac-Mégantic Train Derailment Litig.), 999 F.3d 72, 78–79 (1st Cir. 2021) (discussing Bankruptcy Amendments and Federal Judgeship Act of 1984).

### III.    Standards of Review

"On intermediate appeal to a district court, a final order of the bankruptcy court is subject to the same familiar standards of review normally employed in direct appeals to the courts of appeals in civil cases generally." LaRoche v. Amoskeag Bank (In re LaRoche), 969 F.2d 1299, 1301 (1st Cir. 1992). Accordingly, this Court reviews de novo the Bankruptcy Judge's dismissal of Counts I and II in full and Count IV in part. See Keach v. Wheeling & Lake Erie Ry. Co. (In re Montr., Me. & Atl. Ry., Ltd.), 888 F.3d 1, 6 (1st Cir. 2018). In so doing, the Court "accept[s] the complaint's well-pleaded facts as true and 'draw[s] all reasonable inferences therefrom in [Andrews'] favor.'" Id. (quoting González v. Vélez, 864 F.3d 45, 50 (1st Cir. 2017)). Further, the Court may affirm the decision below based "on any independently sufficient ground made manifest by the record." See Carvalho v. Fed. Nat'l Mortg. Assoc. (In re Carvalho), 335 F.3d 45, 49 (1st Cir. 2003).

Count V is also subject to de novo review, though for a different reason: it is a claim under Massachusetts consumer protection law and is therefore a "non-core" or "related-to" claim. For that reason, the Bankruptcy Judge's decision on that count does not constitute a final order

5

engendering appellate review. See Sheridan v. Michels (In re Sheridan), 362 F.3d 96, 100 (1st Cir. 2004). Instead, the rulings below as to Count V are treated as "proposed findings of fact and conclusions of law to [this Court]." See In re Lac-Mégantic Train Derailment, 999 F.3d at 79 (citing 28 U.S.C. § 157(c)(1)). With respect to the part of Count IV that the parties tried before the Bankruptcy Judge, this Court reviews conclusions of law de novo and findings of fact for clear error. Dewitt v. Stewart (In re Stewart), 948 F.3d 509, 519–20 (1st Cir. 2020).

Finally, because the amended complaint expressly incorporates the Trust Contracts, the authenticity of which is not in question, those exhibits "effectively merge[] into the pleadings." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998). They are thus properly before this Court on appeal. See, e.g., Rodi v. S. New England Sch. of L., 389 F.3d 5, 12 (1st Cir. 2004). To the extent one of the exhibits "contradicts [Andrews'] allegations" in the amended complaint, "the exhibit trumps the allegations." Cheng v. Neumann, 51 F.4th 438, 445 (1st Cir. 2022) (quoting Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000)).

## IV.     Choice of Law

"State law governs interested parties' property rights, the scope of those rights, and the voidability of any such rights in a bankruptcy proceeding." Cancel v. Banco Popular de P.R. (In re Cancel), 7 F.4th 23, 28 (1st Cir. 2021) (citing Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000)). Here, the Property is located in Massachusetts, and the Trust Agreement contains a Massachusetts choice-of-law provision. Further, none of the substantive issues before the Court presents a question of statutory interpretation under federal law. Massachusetts law therefore governs the substantive issues in this appeal. Cf. HSBC Bank USA v. Branch (In re Bank of New England Corp.), 364 F.3d 355, 363 (1st Cir. 2004) (interpreting debt subordination agreement and

explaining that "property interests should not be analyzed differently as a result of a party's involvement in a bankruptcy case" (citing Butner v. United States, 440 U.S. 48, 55 (1979))).

## V.    Discussion

### A.    Quiet Title

Count I, which is styled as a claim to quiet title, asserts that "[r]ecord title to the Property should . . . be transferred back to" Andrews. (Am. Compl. ¶ 70.) The Bankruptcy Judge properly dismissed this claim.

To succeed on a quiet title claim, "both actual possession and the legal title [must be] united in the plaintiff." Rezende v. Ocwen Loan Servicing, LLC, 869 F.3d 40, 43 (1st Cir. 2017) (quoting Daley v. Daley, 14 N.E.2d 113, 116 (Mass. 1938)). Therefore, it is not enough for Andrews "merely to demonstrate better title to the locus than [Equity] possess[es]"; rather, he must "prove sufficient title to succeed in [the] action.'" Bevilacqua v. Rodriguez, 955 N.E.2d 884, 889 n.5 (Mass. 2011) (quoting Sheriff's Meadow Found., Inc. v. Bay-Courte Edgartown, Inc., 516 N.E.2d 144, 146 (Mass. 1987)).

Under Massachusetts law, a "mortgage splits the title in two parts: the legal title, which becomes the mortgagee's, and the equitable title, which the mortgagor retains." Rezende, 869 F.3d at 43 (quoting Bevilacqua, 955 N.E.2d at 894). Here, the amended complaint expressly alleges that Andrews "granted a first-priority mortgage" on the Property to Washington Mutual. (Am. Compl. ¶ 12.) Andrews further alleges that, from 2006 through the filing of the bankruptcy action, he made continuous payments on the loan secured by that mortgage. (See id. ¶ 3.) Based on these allegations, which at this juncture are accepted as true, the Court cannot reasonably infer that Andrews possesses legal title to the Property. Without legal title, Andrews cannot prevail in a quiet

7

title action. See Rezende, 869 F.3d at 43. Accordingly, the Court does not reach his remaining arguments that concern Equity's interest in the Property. Count I was properly dismissed.

    B.    Equitable Claims

Count II (Equitable Mortgage) and Count IV (Unjust Enrichment) in essence seek to void the quitclaim deed and Trust Contracts or otherwise convey the Trust's interest in the Property to Andrews. Both counts fail, however, because the parties' written agreements foreclose the availability of equitable relief.

    *i.*    *Equitable Mortgage*

"It is settled that a debtor under an express mortgage can convey his equity of redemption by a quitclaim deed." Fales v. Glass, 402 N.E.2d 1100, 1103 (Mass. App. Ct. 1980). But "[w]hen a deed (absolute on its face) is given at the time a debt is incurred for the purpose of securing payment of the debt, 'a court of equity will treat the deed according to its true nature as a mortgage.'" Levenson v. Feuer, 803 N.E.2d 341, 349 (Mass. App. Ct. 2004) (quoting Fales, 402 N.E.2d at 1102). "Whether a deed absolute in form is an equitable mortgage depends upon the intention of the parties as shown in the circumstances of its negotiation and execution." Allen v. Mut. Acceptance Corp., 215 N.E.2d 784, 785 (Mass. 1966). "[T]he party asserting that a deed absolute in form is an equitable mortgage has the burden of proving that it was intended as such." Jacobson v. Jacobson, 138 N.E.2d 206, 209 (Mass. 1956).

Here, the parties executed the Trust Contracts on the same day that Andrews executed the quitclaim deed, which itself expressly references the Trust. Under Massachusetts law, where multiple instruments are executed as "part of a single transaction," they "are to be treated as an integrated agreement setting forth the entire understanding reached by the parties." Dahua Tech. USA, Inc. v. Zhang, 138 F.4th 1, 13 (1st Cir. 2025) (quoting Wilmot H. Simonson Co. v. Green

Textiles Assocs., Inc., 755 F.2d 217, 220 (1st Cir. 1985)). Thus, to ascertain the parties' intention at the time Andrews executed the deed, the Court "read[s] the allegations in the complaint in light of the full text of" the Trust Contracts. Clorox Co., 228 F.3d at 32. In doing so, the Court considers the plain meaning of "the words used by the parties," the terms of the Trust Contracts "taken as a whole," as well as the "surrounding facts and circumstances" of the conveyance. Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d 283, 288 (Mass. 1991).

The express terms of the Trust Contracts evince an intention to effect an absolute conveyance of Andrews' equity of redemption. The Trust Agreement itself unequivocally states that "[n]o Beneficiary now has, or shall subsequently at any time have, any right, title, or interest in or to any proportion of the real estate as such, either legal or equitable . . . ." (Am. Compl., Ex. B at § 3.) Such absolute terms are "not the kind of language which would ordinarily be used in connection with a mortgage." Jacobson, 138 N.E.2d at 209.

By the same token, the Trust Contracts belie an inference that the parties intended the conveyance to serve merely as a means to secure Equity's capital. For example, the Trust does not terminate upon the repayment of the loaned capital. Compare Am. Jur. 2d, Mortgages § 78 ("A deed that contains or is accompanied by an agreement that it shall be canceled upon payment of a debt is a mortgage."). Similarly, the Trust Agreement does not set forth a schedule for repayment of Equity's capital during the life of the Trust. Instead, the agreement contemplates that Equity is to recoup its capital from proceeds of a sale of the Property upon termination of the Trust.

Finally, that Andrews retains a right of first refusal upon termination of the Trust does not, alone, suffice to overcome the parties' clear intention to effect an absolute conveyance via quitclaim deed, as is reflected in the Trust Contracts' express terms. See Jacobson, 138 N.E.2d at 209 (relying in part on "provisions of the agreement" at issue to hold that deed was "a conveyance

with an option to repurchase rather than an equitable mortgage"); accord Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004) (interpreting "contract as a whole" as "reflect[ing] the parties' intent").

For these reasons, Andrews has failed to allege sufficient facts establishing that an equitable mortgage is a proper remedy available to him. The Court therefore need not reach his remaining arguments on this claim. Count II was properly dismissed.

### ii. Unjust Enrichment

The Court also affirms the Bankruptcy Judge's dismissal in part of Count IV. A party cannot "override an express contract by arguing unjust enrichment," Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006), and Massachusetts law "will not imply a contract where there is an existing express contract covering the same subject matter," Zarum v. Brass Mill Materials Corp., 134 N.E.2d 141, 143 (Mass. 1956). See, e.g., Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 84 (1st Cir. 2020) (affirming dismissal of unjust enrichment claim where unambiguous terms of operative contract provided plaintiff adequate remedy at law).

So it is here. Andrews asserts that Equity was unjustly enriched by Andrews' "making all required mortgage payments, paying all taxes, insuring, and otherwise maintaining the Property." (Am. Compl. ¶ 82.) But under the express terms of the Occupancy Agreement, Andrews agreed to bear each and all of these costs. (See Am. Compl., Ex. B at § 12 ("all real property taxes and assessments"); id. at § 16 ("full insurance coverage"); id. § 2(b) ("[t]he principal and interest . . . on all loans secured by the [Property],"); id. at § 3 ("[a]ll repairs and maintenance").)

To the extent Andrews may have been a holdover tenant during the relevant period, the parties remained subject to the written terms of the Occupancy Agreement absent a new agreement. See Addis v. Steele, 648 N.E.2d 773, 777 (Mass. App. Ct. 1995) (explaining that holdover tenant became tenant at will "upon the terms of the expired, written lease" (citing Boudreau v. Johnson,

134 N.E. 359, 361 (Mass. 1922))). Yet, the amended complaint does not allege that the parties entered into a new agreement that modified Andrews' obligation to pay the aforementioned costs. (See Am. Compl. ¶ 3 (alleging that Andrews had "little, if any, correspondence" with Equity between 2006 and 2023).) Nor does Andrews assert that he paid more than was required by the express terms of the operative agreements. Further, as the Bankruptcy Judge noted, Andrews benefitted from retaining the Property at the time he paid the challenged costs. Thus, to the extent Equity may have received a benefit on account of Andrews' performance under the parties' agreements, the amended complaint fails to plausibly allege that any such benefit was *unjustly* conferred. The Court affirms the Bankruptcy Judge's dismissal of Count IV in part.

As for the remainder of that count, the Bankruptcy Judge initially denied Equity's motion to dismiss Count IV insofar as Andrews sought damages that he allegedly incurred after March 18, 2018. Following a bench trial on those claims, the Bankruptcy Judge entered judgment in favor of Equity. The Court finds no basis in the appellate record to disturb that judgment.

    C.      Massachusetts General Laws Chapter 93A

Finally, Andrews contends that the Bankruptcy Judge erred in determining that the statute of limitations period for Count V, his Chapter 93A claim, "ran at the latest in July 2005 when [Andrews] brought an adversary proceeding." (See Appellant's Br. App. Vol. 2 at 206, 34:6–11 (dkt. no. 15).) As alleged in the amended complaint, Count V challenges Equity's "attempt[s] to engage in, promote, participate in, or carry out a foreclosure rescue transaction for compensation or gain." (Am. Compl. ¶ 89.) The challenged conduct includes, among other things, "threatening to terminate the Trust, terminating the Trust, serving [Andrews with] a 30-Day Notice to Quit, [and] filing and serving an eviction complaint." (Id.) Under this theory, Equity engaged in "unfair or deceptive actions in violation of [Chapter] 93A" as recently as 2023, which is the same year

11

that Andrews commenced the instant action. (Br. of Appellant Scott Andrews at 49.) Andrews thus argues that Count V is timely because all of Equity's violative actions fall "well-within the four (4) year statute of limitations" governing Chapter 93A claims. (Id. at 51.)

"Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998). Relevant here, the statute of limitations period for a claim under Chapter 93A is four years after "the cause of action accrues." Mass. Gen. Laws ch. 260, § 5A. However, Massachusetts law also "recognizes a 'discovery rule' that tolls the running of the limitations period in certain circumstances." Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 47 (1st Cir. 2004) (citing Franklin v. Albert, 411 N.E.2d 458, 463 (Mass. 1980); Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 125–26 (Mass. App. Ct. 1990)); see also Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC, 794 F.3d 200, 204 (1st Cir. 2015) (explaining that state law governs "when a state-created cause of action accrues" (quotations omitted)).

Under the discovery rule, a Chapter 93A cause of action "'accrues' when a plaintiff knows or reasonably should know of the harm caused by a defendant's conduct." Levin v. Berley, 728 F.2d 551, 556 (1st Cir. 1984) (quoting Franklin, 411 N.E.2d at 463). Thus, to trigger the limitations period, a plaintiff need "not apprehend the full extent or nature of an injury in order for a cause of action to accrue." Riley v. Presnell, 565 N.E.2d 780, 784 (Mass. 1991). Rather, the period begins when a plaintiff "has enough information to suggest that he has suffered an injury caused by the defendant's conduct." Wolinetz, 361 F.3d at 48 (citing Int'l Mobiles, 560 N.E.2d at 124).

Here, the limitations period began on January 6, 2005, when the parties executed the Trust Contracts. As alleged, Andrews' asserted injuries appear to overlap significantly with his duties

under the Trust Agreement and the Occupancy Agreement, and the material terms of those contracts "were apparent" when Andrews signed them on January 6, 2005. See Latson v. Plaza Home Mortg., Inc., 708 F.3d 324, 327 (1st Cir. 2013) (rejecting tolling argument where challenged "terms" and "implications of [contractual] burdens were apparent" at signing); accord Szymanski v. Bos. Mut. Life Ins. Co., 778 N.E.2d 16, 21 (Mass. App. Ct. 2002) (explaining that a "plaintiff may be put on 'inquiry notice' when he is informed of the facts that suggest he has been injured"). Thus, Andrews' allegation that "he would not have signed these documents if he was aware of all relevant and material facts," (Am. Compl. ¶ 24), is not sufficient to warrant equitable tolling, cf. Latson, 708 F.3d at 327 (explaining that under Massachusetts law, "the terms of written agreements are binding whether or not their signatories actually read them"). Without equitable tolling, the statue of limitations for a Chapter 93A claim arising out of the Trust Contracts ran on January 6, 2009.

The amended complaint therefore cannot rely on Equity's alleged conduct in 2005 as the factual predicate for Andrews' claim that Equity's alleged conduct in 2023 was unfair or deceptive. Yet, that is precisely what Count V purports to do. Equity's alleged actions in 2023—e.g., commencing a Housing Court action, serving a Notice to Quit, and terminating the Trust—are not inherently, or even apparently, unfair or deceptive acts in themselves. Hence, the amended complaint asserts that Equity's actions were unfair and deceptive because they were part of an attempt to enforce the terms of an alleged foreclosure rescue transaction. But that assertion, in addition to constituting a pure legal conclusion, relies on factual allegations that date to the 2005 formation of the Trust, i.e. the alleged foreclose rescue transaction. Thus, Equity's alleged attempts to enforce its contractual rights in 2023 originate from and are "the natural, if bitter, fruit of" the Trust Contracts and the related factual context from 2005. O'Brien v. Deutsche Bank Nat'l Tr.

13

Co., 948 F.3d 31, 37 n.4 (1st Cir. 2020). Count V is therefore governed by a four-year limitations period that began on January 6, 2005. For these reasons, Andrews' Chapter 93A claim is time-barred.

## VI.    Conclusion

For the foregoing reasons, the Bankruptcy Judge's dismissal of Counts I and II in full is AFFIRMED. The Bankruptcy Judge's dismissal of Count IV in part is AFFIRMED. The Bankruptcy Judge's judgment in favor of the appellee as to the remainder of Count IV is AFFIRMED. Count V, the state-law claim, is DISMISSED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

14